### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

ALEX CHARTS and CHARTS  :
INSURANCE ASSOCIATES, INC.  :
   Plaintiffs,     :
           :
v.          :  Civil Action No. 3:97CV1621(CFD)
           :
NATIONWIDE MUTUAL INSURANCE :
CO., et al.       :
   Defendants

### RULING ON POST-TRIAL MOTIONS

  The plaintiffs, Charts Insurance Associates, Inc. ("CIAI") and Alex Charts (collectively "Charts"), brought this three-count action against Nationwide,[1] alleging violations of the Connecticut Franchise Act ("the Franchise Act"), Conn. Gen. Stat. § 42-133e *et seq*., the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq*., and the implied covenant of good faith and fair dealing.  Following a nine-day trial, the jury returned a verdict in favor of Charts on all three counts and awarded damages of $2,300,000.  Judgment was entered on December 13, 2004.  Pending are three post-trial motions: (1) Nationwide's motion for judgment as a matter of law on all three counts pursuant to Fed. R. Civ. P. 50, or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59; (2) Charts' motion for attorney's fees; and (3) Charts' motion for prejudgment interest.  For the following reasons, Nationwide's motion

---

  [1]The defendants are Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Variable Life Insurance Company, and Colonial Insurance Company of California.  They will be referred to collectively as "Nationwide."

is granted in part and denied in part.  Charts' motion for prejudgment interest is denied, and Charts' motion for attorney's fees is granted, as modified by the Court.

The procedural background of this case has been recounted in prior rulings.  See Alex Charts and Charts Ins. Assoc., Inc. v. Nationwide Mutual Ins. Co., 16 Fed. Appx. 44 (2d Cir. 2001); Charts v. Nationwide Mut. Ins. Co., 300 B. R. 552, 553 (2003).  In order to frame the discussion of the parties' post-trial motions, however, the Court sets forth the following limited background: Charts brought this action against Nationwide on August 11, 1997, claiming various violations of Connecticut law arising from Nationwide's termination of Charts' insurance agency.  After three years of contested motion practice, Magistrate Judge William I. Garfinkel issued a recommended ruling granting Nationwide's motion for summary judgment on the ground that, inter alia, Charts' claims against Nationwide were part of the bankruptcy estate of Alex and Helena Charts, and as such could not be asserted here by Alex Charts and CIAI.[2]  On September 29, 2000, this Court approved the recommended ruling on that ground, over Charts' objection, and judgment entered for Nationwide.[3]  The Second Circuit, without addressing the merits of this Court's ruling, remanded to the District Court, concluding that the bankruptcy trustee was a necessary party in making a determination as to standing.  On remand, therefore, this Court vacated its prior ruling and the action was consolidated with the bankruptcy action.

---

[2]"On December 14, 1992, Alex Charts and his wife Helena filed their voluntary petition under Chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut. On February 13, 1996, the Bankruptcy Court issued an Order of Discharge of Debtor, and the bankruptcy case was closed on March 1, 1996."  Charts v. Nationwide Mut. Ins. Co., 300 B. R. 552, 553 (2003).

[3]Judge Garfinkel also recommended that the action be dismissed on the basis of judicial estoppel, but that ground was not adopted by the District Court.

2

Nationwide then filed a new motion for summary judgment, essentially relying on the same arguments presented in its first motion. On September 30, 2003, after reconsidering the parties' arguments, and hearing from the trustee of Charts' bankruptcy, the Court denied Nationwide's motion for summary judgment, finding that the claims were not property of the bankruptcy estate and Charts and CIAI had standing to assert them in this case.

On November 29, 2004, the case proceeded to trial. At the conclusion of Charts' case-in-chief, Nationwide made an oral motion for judgment as a matter of law pursuant to Rule 50. The Court denied that motion without prejudice to Nationwide renewing it at the conclusion of all the evidence. Nationwide made a second motion for judgment as a matter of law at the conclusion of all the evidence. The Court reserved judgment until after the jury had reached its verdict. On December 10, 2004, the jury returned its verdict in favor of Charts on all three counts. On December 13, 2004, the Court entered judgment in accordance with the jury's verdict. On December 23, 2004, Nationwide renewed its request for judgment as a matter of law or a new trial by filing a motion with this Court. Both parties subsequently submitted numerous memoranda of law in response to Nationwide's motion.

On January 12, 2005, Charts filed a motion for attorney's fees and a motion for prejudgment interest. Those motions also have been fully briefed by the parties. The Court heard arguments on all post-trial motions on July 20, 2005.[4]

---

[4]Nationwide filed its post-verdict motion for a judgment as a matter of law or, in the alternative, for a new trial, within the ten-day limitation set forth in Fed. R. Civ. P. 50(b). At that time, however, the transcript of this trial had not been completed. Consequently, the Court allowed the parties additional time beyond the date when the transcript was completed to file their memoranda.

<u>**NATIONWIDE'S MOTION FOR JUDGMENT AS A MATTER OF LAW,**</u>
<u>**OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**</u>

Nationwide's post-verdict motion seeks judgment as a matter of law as to all counts pursuant to Rule 50, or, in the alternative, a new trial on all counts and/or damages pursuant to Rule 59.  The Court turns to the motion for judgment as a matter of law first.

**I      Motion for Judgment as a Matter of Law**

A) <u>Standard of Review</u>

"If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment . . . ."  Fed. R. Civ. P. 50(b).  When ruling on such a post-verdict motion for judgment as a matter of law, a district court may allow the judgment to stand, order a new trial or direct entry of judgment as a matter of law.  <u>Id</u>.

A Court may properly grant a post-verdict Rule 50 motion when "there can be but one conclusion as to the verdict that reasonable men could have reached." <u>Merrill Lynch Interfunding, Inc. v. Argenti</u>, 155 F.3d 113, 120 (2d Cir. 1998) (quoting <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 14 (2d Cir. 1993)).  In other words, "a Rule 50 motion for judgment as a matter of law must be granted where '(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" <u>Hernandez v. Keane</u>,

341 F.3d 137, 143-44 (2d Cir. 2003) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784

F.2d 127, 132 (2d Cir. 1986).  In making such a determination, a court "must view the evidence

in a light most favorable to the nonmovant and grant that party every reasonable inference that

the jury might have drawn in its favor."  Samuels, 992 F.2d at 16.   A court "cannot assess the

weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment

for that of the jury."  Id (quoting Mattivi v. South African Marine Corp., 618 F.2d 163, 168 (2d

Cir. 1980)).  Instead, a court "must defer to the credibility assessments that may have been made

by the jury and the reasonable factual inferences that may have been drawn by the jury."

Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

In considering the forgoing principles of law, it has been noted that the moving party

bears a "heavy burden" on a post-verdict Rule 50 motion.  Concerned Area Residents for the Env't

v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994); Matthews v. Armitage, 36 F. Supp. 2d 121,

124 (N.D.N.Y. 1999); see also Holt v. Home Depot, U.S.A. Inc., 2004 WL 178604 (D. Conn.

Jan. 22, 2004) (finding that the "stringent standards that apply to" a post-verdict Rule 50 motion

were not met).  Moreover, "[b]ecause a judgment as a matter of law intrudes upon the rightful

province of the jury, it is highly disfavored."  Sabir v. Jowett, 214 F. Supp. 2d 226, 236 (D.

Conn. 2002) (quotations and citations omitted).

Nationwide's renewed motion for judgment as a matter of law challenges the jury's

verdict on each count separately.  Each argument will be addressed in turn.[5]

---

[5]Nationwide does make one argument directed at all three counts, however: renewing the
argument that it presented in its summary judgment papers, Nationwide's post-verdict Rule 50
motion argues that it is entitled to judgment as a matter of law on all three counts on the ground
that Charts lacked standing because the claims were part of the bankruptcy estate.  The Court
rejected that argument when ruling on Nationwide's second motion for summary judgment.  The

B) Connecticut Franchise Act

The jury found that Nationwide violated the Franchise Act when it terminated its contracts with Charts and CIAI, and Nationwide now challenges this finding on several grounds.

i) Jury Issue

Nationwide first claims that the Franchise Act claim should not have gone to the jury. The Court rejects this argument for several reasons. First, and most important, it was not raised in the pre-verdict Rule 50 motion. See Rand-Whitney Containerboard Ltd. Partnership, 289 F. Supp. 2d at 67; see also footnote 5 of this ruling. Second, although Charts' complaint and jury demand was filed August 11, 1997, at no subsequent time did Nationwide object to the submission of the Franchise Act claim to the jury.[6]   See Fed. R. Civ. P. 39(a)(2) (allowing for a

---

Court need not revisit that decision at this time, however, because Nationwide failed to make this argument in its original pre-verdict Rule 50 motion for judgment as a matter of law.   As the Second Circuit recently has noted, a party may only "renew" an earlier "request for judgment as a matter of law" in a post-verdict Rule 50 motion.  Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005); see also See Fed. R. Civ. P. 50 advisory committee's note (re 1991 Amendment, Subdivision (b)) ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion"); Rand-Whitney Containerboard Ltd. Partnership v. Town of Montville, 289 F. Supp. 2d 62, 67 (D. Conn. 2003) (A post-verdict Rule 50 motion "cannot assert new grounds; the rules limit the grounds for post-verdict judgment as a matter of law to those 'specifically raised' in the pre-verdict motion")(quoting Lambert v. Genesee Hosp., 10 F.3d 46, 53-54 (2d Cir. 1993)).

The Second Circuit has indicated, however, "a [post-verdict] Rule 50(b) motion should not be granted [on a ground not raised previously] unless it is required to prevent manifest injustice." Broadnax, 415 F.3d at 268 (quotations omitted). Nationwide has not responded to Charts' argument that this issue was not properly raised in the pre-verdict Rule 50 motion, much less argued that the Court should address it to prevent a "manifest injustice." In any event, the Court finds that such a result will not occur, as the evidence at trial did not alter the Court's prior conclusion on the standing issue.

[6]Because the jury demand did not specify which counts should be submitted to the jury, Charts was "deemed to have demanded trial by jury for all the issues so triable." Fed. R. Civ. P. 38(c).

party to object to a jury demand).  Indeed, although Nationwide made several objections to the

Court's proposed instructions on the Franchise Act count at the charging conference, none

addressed the underlying question of whether the Franchise Act claim should be submitted to the

jury.  Only now, after the matter already has been submitted to the jury and a plaintiffs' verdict

returned, Nationwide raises its objection.  The Court finds that such an objection has been

waived.[7]  Compare Thompson v. Parkes, 963 F.2d 885 (6th Cir. 1992) (finding that the district

court improperly found that the claims were equitable and took them from the jury one week

*after* the jury had returned its verdict) with  Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d

821, 822 (2d Cir. 1994) (finding that the district court properly took an equitable claim from the

jury at the close of evidence, *before* the case was given to the jury). [8]

     Prior decisions from the Connecticut Supreme Court and the United States Court of

Appeals for the Second Circuit buttress this conclusion.  In Associated Investment Co. Ltd.

Partnership v. Williams Associates IV, 230 Conn. 148, 162, 645 A.2d 505 (1994), the

Connecticut Supreme Court held that plaintiffs were not entitled to a jury trial on CUTPA

---

[7]Nationwide also requests that the Court certify this question to the Connecticut Supreme Court.  This request is also rejected as untimely, as this is the first time that Nationwide has made such a request.

[8]In addition, the Court notes that the pretrial order indicated that this case would be a jury trial, and that the jury would be comprised of nine jurors.  At no time did Nationwide object to the pretrial order, or otherwise seek clarification that the Franchise Act claim would not be submitted to the jury.  See Fed. R. Civ. P. 16(e) ("[a pretrial order] shall control the subsequent course of the action unless modified by a subsequent order"); Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 503 (2d Cir. 1989) (noting that, although "total inflexibility is undesirable," a "pretrial order[] should not be changed lightly") (quoting Fed. R. Civ. P. 16(e) advisory committee notes and Clark v. Pennsylvania R.R. Co., 328 F.2d 591, 594-95 (2d Cir. 1964)).

claims.[9]   In a subsequently issued decision, however, that Court stated: "A party who wishes CUTPA issues to be tried to the court, therefore, need only move to strike such a case from the jury list.  *If the parties fail to take such action, however, CUTPA issues may be tried to the jury*." Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 490 n.13, 656 A.2d 1009 (1995) (emphasis added).

The Second Circuit recently addressed a similar issue, which was also an issue of first impression in this circuit, namely "whether, where one party requests a jury trial on the lost wages issue [under Title VII] and the party's opponents fail to object, the court is permitted, because the opponents may be deemed to have consented, to submit the issue for a non-advisory jury determination." Broadnax, 415 F.3d at 271.  The Second Circuit, adopting the positions taken by the Fifth and Seventh Circuits, held that "that when a party demands jury consideration of lost wages under Title VII and the party's opponent fails to object, Rule 39(c) permits the district court to submit the lost wages issue for a non-advisory jury determination." Id. at 272. The Second Circuit concluded that the district court's submission of the issue of lost wages to the jury was not reversible error because "the [defendant] failed to object to sending the lost wages issue to the jury, despite [plaintiff]'s including in her Complaint the statement that '[t]he plaintiff claims trial by jury of the issues in this case.'" Id.

Although the Court believes that Nationwide has waived its objection to the submission of the Franchise Act claim to the jury, it nevertheless bears noting that there is no decision from

_____

[9]The Connecticut legislature subsequently amended CUTPA to provide a right to jury trial in such actions.  See Conn. Gen. Stat. § 42-110g ("In any action brought by a person under this section there shall be a right to a jury trial . . . . "); Lorenzetti v. Jolles, 120 F. Supp. 2d 181, 187 (D. Conn. 2000) (noting the legislature's response to Williams Associates IV).

the Connecticut appellate courts addressing the question of whether a Franchise Act claim may be submitted to a jury, or holding that a Franchise Act claim was improperly submitted to a jury. There are, however, conflicting trial court decisions on this issue.  One judge on the Connecticut Superior Court has found that a plaintiff does not have a right to a jury trial on a Franchise Act claim.  Hartford Electric Supply Co. v. Allen-Bradley Co., Inc., 28 Conn. L. Rptr. 447, 2000 WL 1918005 (Conn. Super. Ct., Dec. 18, 2000) ("[n]o Connecticut cases have accorded a right to trial by jury in a [Franchise Act] case").  A judge in this District, however, has submitted such a claim to a jury and entered judgment in accordance with that jury's verdict.  In Valentino v. S.B. Thomas, Inc., 2001 WL 34118029 (D. Conn., Oct. 28, 2001), after a five-day trial, a jury found that there was a franchise agreement between the parties and that the defendants had violated the Connecticut Franchise Act when it terminated the plaintiff's franchise and awarded the plaintiff $60,000 in damages.  Although the defendants moved for judgment as a matter of law pursuant to Rule 50, it appears that their motion focused on the evidentiary support for the jury's findings, and it did not raise the preliminary issue of whether the Franchise Act claim should have been submitted to the jury.  Judge Eginton denied the defendants' motion in its entirety, entered judgment in accordance with the jury's verdict, and awarded the plaintiff prejudgment interest and attorney's fees.

In any event, because Nationwide failed to timely raise this issue at any time during this litigation, much less in its pre-verdict Rule 50 motion, it is not a proper ground for a post-verdict Rule 50 motion for judgment as a matter of law.

ii) The Connecticut Insurance Code

Nationwide next argues that because insurance companies and their agents are subject to extensive regulation by the Connecticut Insurance Code, § 38a-702 *et seq*., the Connecticut legislature could not have intended for insurance agents to also be protected by the Franchise Act. More specifically, Nationwide argues that because the legislature has failed to enact a "good cause" termination requirement within the Insurance Code, the legislature could not have intended for the "good cause" requirement set forth in the Franchise Act to apply to insurance agents. See Conn. Gen. Stat. § 42-133f(a). This argument was initially raised in Nationwide's Motion to Dismiss. See "Reply to Plaintiff's Objection to Defendant's Motion to Dismiss" [doc. # 15] at 2-4. The Court rejected that argument in its Ruling on the Motion to Dismiss [doc. #6]. Counsel also briefly raised this issue in its initial Rule 50 argument.

The Court reaffirms its decision denying the Motion to Dismiss, and no evidence was presented at trial which alters the Court's conclusion that the Connecticut legislature did not intend to preclude insurance agents from invoking the protections of the Connecticut Franchise Act. The decisions from other jurisdictions cited by Nationwide to support its view that the Connecticut legislature intended its franchise act to not cover insurance agents concern factual settings and legislative and regulatory schemes different from the Connecticut statutes and regulations. Also, Nationwide's catalogue of failed legislative attempts to impose a specified good cause termination requirement for insurance agents in Connecticut – submitted after trial was completed – shows no clear indication that the Connecticut legislature intended such preemption by the insurance statutes and regulations. Finally, Nationwide has not made a compelling argument in the absence of clear legislative intent why an insurance agent should not

be protected by the Connecticut Franchise Act if a jury concludes that he or she otherwise meets the tests for a franchise relationship.

iii) Evidentiary Support

The Court instructed the jury that a "franchise" relationship exists only when both of two requirements are met:

(1) There must be an oral or written agreement or arrangement in which a franchisee is granted the right to engage in the business of offering, selling, or distributing services under a marketing plan or system prescribed in substantial part by a franchisor; and

(2) The operation of the franchisee's business pursuant to this marketing plan or system must be substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

Nationwide claims that there was insufficient evidence before the jury to find in favor of Charts on the first element, and, therefore, it is entitled to judgment as a matter of law on the Franchise Act count (Nationwide does not challenge the jury's finding as to the second element).

As to the first element, the Court further instructed the jury as follows: "The first element has a two step inquiry. First, Charts must prove by a preponderance of the evidence that there was an oral or written agreement or arrangement in which it was granted the right to engage in the business of offering, selling, or distributing insurance policies offered by Nationwide." It is undisputed that Nationwide had entered into contracts with both Alex Charts and CIAI. Moreover, according to the parties' stipulation of facts, "Alex Charts was the President of Charts Insurance Associates, Inc. ("CIAI"), which was a Connecticut corporation *engaged in the business of selling and servicing* Nationwide insurance policies and other related products within the State of Connecticut." This stipulation was read to the jury and was also supported by other

11

evidence at trial, including testimony from Ruben Gainey, Nationwide's Vice President and Regional Manager for New England, that an agent was in the business of selling and servicing Nationwide polices.  (Trans.12/1/04, pg. 109).[10]   Therefore, this admission and the consistent evidence gave the jury sufficient evidentiary support for its finding that Nationwide had granted Charts and CIAI "the right to engage in the business of offering, selling, or distributing services . . . ."  In addition, although not discussed by either party, the Court notes that the Franchise Act may apply if a party was granted a right to "engage in the business of *offering*" services. Although Nationwide disputes whether Charts had the ability to bind it to a policy of insurance, and therefore actually could "sell" such a policy, there is no dispute as to Charts' ability to "offer" Nationwide policies to customers, and to execute an initial, non-binding contract with customer. Moreover, as  to Charts' ability to bind Nationwide to a policy of insurance, Charts testified that, based on his prior success with Nationwide, he was made a "plus agent," and therefore he did have the ability to bind Nationwide. (Trans. 12/01/04, pg. 36-37).  In sum, there was substantial evidence from which the jury could have found that Charts satisfied the first step of the first element.

_____

[10]Gainey was initially unavailable to testify at trial, and, therefore, his deposition transcript was read into evidence, absent objection.  At that time, the Court instructed the jury as follows: "Ladies and Gentlemen of the jury, you will now be read a transcript of testimony given previously by a witness in this case who is now unavailable to testify in person at this trial.  You are not to speculate as to why this witness is unavailable and you are to regard this testimony in the same way as if it were given at trial in person before you."  Gainey testified by deposition during the Plaintiffs' case, and personally appeared to testify during the Defendants' case. (Trans. 11/29/04, pg. 62).

As to the second step of the first element, namely whether Charts offered, sold or distributed Nationwide policies pursuant to a marketing plan or system which was prescribed in substantial part by Nationwide, the Court instructed the jury as follows:

> This requirement focuses on the amount of control exercised in the conduct of Charts' business as a significant factor in determining whether a franchise was created. You should consider several factors to determine whether the control, if any, exercised by Nationwide over Charts rose to the level of a prescribed marketing plan or system. You should consider whether it was Nationwide or Charts that had the power to set the retail prices charged to Charts' customers. Price is perhaps the most fundamental aspect of a marketing plan, and the ability to set prices is quite indicative of a franchisor's control. However, fixing prices alone may not be determinative of a franchisor's control. You also should consider, for example, whether Nationwide had the power to control other aspects of operation of Charts' insurance agency, including its hours of operation, its days of operation, its advertising, its lighting, its sales quotas and its hiring. In addition, you should consider whether Nationwide provided Charts with such things as financial support and management training.
>
> There is no precise formula as to how many of these factors must be present to find the level of control indicative of a franchise, or as to the weight each factor should be given in each case. Instead, *you should consider these factors and give each the weight you believe it deserves, considering the significance of each factor to the business relationship between Nationwide and Charts.* (Emphasis added).

As evidenced by that charge, the second step of the first factor is a balancing test, and the jury had considerable discretion to consider evidence concerning the business relationship between the parties. After reviewing the transcripts and the parties' memoranda of law, the Court is unable to find that, when exercising this discretion, the jury employed "sheer surmise and conjecture." Hernandez, 341 F.3d at 143-44. Indeed, there was considerable testimony from Mr. and Mrs. Charts, as well as other Nationwide employees, that supports the jury's finding that Charts operated pursuant to a marketing plan or system prescribed in substantial part by Nationwide. For example, when asked if agents operated under a marketing plan prescribed by

13

Nationwide, Gainey answered "yes."  In addition, Gainey testified that Nationwide employed

Agency Managers to ensure that agents met Nationwide's standards, that Nationwide provided

agents with samples to use as local advertisements and that Nationwide had to sign off on any

use of the Nationwide logo in local advertisements.  (Trans. 12/1/05, pg. 103-05).  An Agency

Manager that was assigned to the Charts franchise, Mark Kapatoes, testified that, as part of his

job, he would "sit down with [the agents] and go through what they had in plans as far as

advertising, *marketing*, really anything that you would do . . . to run a good business."  (Trans.

11/30/2004, pg. 47) (emphasis added).[11]  In addition, in response to a question asking "in what

sorts of matters would you act as a liaison between the agents and Nationwide," Kapatoes replied

that, for example, "we would run through marketing plans."  (Id. at 48)   Although Nationwide

contends that it presented evidence to refute a finding that Charts operated pursuant to a

marketing plan or system subscribed in substantial part by Nationwide, the Court "cannot assess

the weight of conflicting evidence" at this stage of the litigation.   Samuels, 992 F.2d at 16;

Mattivi, 618 F.2d at 168.  Thus, Nationwide's post-verdict Rule 50 motion on this ground is

denied.

       iii) "Good Cause" Shown

       Finally, Nationwide argues that, even if Charts was a franchise, it had "good cause" to

terminate that franchise.  See Conn. Gen. Stat. 42-133f(a).  Specifically, Nationwide contends

that Charts violated the Connecticut Insurance Code by paying for the policies of at least two

individuals, and, therefore, they had "good cause" to terminate him.  As Charts notes in response,

---

[11]Kapatoes was unavailable to testify at trial, and, therefore, his deposition transcript was
read into evidence, absent objection.

however, at no time during the trial did Nationwide introduce the appropriate provisions of the

Insurance Code into evidence, or elicit testimony from any witness stating that the reasons

underlying the termination of the franchise were violations of state law.  Indeed, in the opening

statement made by Nationwide's counsel, the jury was told that Nationwide "investigated the

allegations that the Charts had engaged in [rebating]" and "conclud[ed] that he had violated

*company policy and practice*."  In conformance with this opening statement, Nationwide failed to

present any evidence to the jury that Charts had violated the provisions of the Insurance Code,

and that this was the reason for his termination.  It was not until after the evidence was concluded

and when Nationwide filed a proposed supplemental jury instruction on the Insurance Code and

rebating that this issue was raised before the Court.  For that reason, the Court denied the

supplemental request, and the provisions of the Insurance Code were never presented to the jury.

Moreover, the jury could have found that the evidence submitted by Nationwide on this

ground was not persuasive.  Nationwide's argument essentially is that because Alex Charts paid

the premiums on policies for the policy holder, he engaged in illegal "rebating," and, therefore, it

had "good cause" to terminate his franchise.  There appear to be three incidents in which Alex

Charts initially paid the premiums for the policy holder.  In the first incident, Charts paid the $54

premium for the first year of a policy issued to Anne Elizabeth Turoczi, the niece of Missy

Brayton, a woman who worked for CIAI.  Although Brayton testified at trial that Charts had paid

the premium on her niece's policy, she admitted on cross-examination that she was unaware that

her niece's parents had reimbursed Charts the full premium amount a short time thereafter, and a

copy of the Turoczis' check to Charts was submitted into evidence. (Trans. 12/2/04, pg. 137-38,

15

and Plaintiffs' Ex. 81).  Charts also testified that he was reimbursed for this advance of the

Turoczi premium.  (Trans. 12/01/04, pg. 48).

In the second incident, it appears that Charts paid some premiums on a $1,000,000 life

insurance policy issued to Mario Boccarossa, his Nationwide Agency Manager at the time.  At

trial, Alex Charts testified that: "[W]hen [Boccarossa] came to me, I reminded him that I didn't

want to get involved in paying any premiums.  Okay.  He was responsible for all the premiums.

Okay.  Like even when we started the policy, and he assured me that would be the case." (Trans.

12/01/04, pg. 61).  Charts further testified that, although Boccarossa had paid some of the

premiums a "few months" later, he was then replaced by Kapatoes as Agency Manager.

Boccarossa asked Charts to pay some of the outstanding premiums, in the amount of $6,000, and

"he would make it up as soon as he could." (Id).  Although Boccarossa failed to pay that money

back, Charts testified that he did not sue for the money because he didn't think he was at the

"stage" to sue "his manager," and, moreover, "[it] wasn't enough money for me to bother

pay[ing] a lawyer and going after." (Id. at 62).

In the third incident, Charts paid the first year premiums for two policies issued for the

twin sons of Linda Mello, soon after Mello's husband had died.  Mello was a secretary in

Nationwide's district office, and she worked for both Kapatoes and Boccarossa when those

individuals served as the Agency Manager for the Charts franchise.  The total amount advanced

by Charts' for those policies totaled $250.  Although Mello never repaid that amount, she has

kept those policies active and has paid all of the remaining premiums herself.   Charts testified

that he expected to receive the advanced premium back from Mello, but that he did not "see any reason to chase her for it" and that he considered it a "charitable gift."  (Trans. 12/1/04, pg. 45-46).

Nationwide may be correct in arguing that the evidence concerning these three incidents could provide the jury with enough evidentiary support for a finding that Nationwide had "good cause" terminate the franchise.  However, the jury also had enough evidentiary support to find that there was not "good cause" for termination.  For example, the termination letter sent by Nationwide to Charts, which was entered into evidence, fails to mention the "rebating" incidents as a ground for the termination. (Plaintiffs Ex. 49).  In addition, other Nationwide employees testified that they had engaged in similar actions when selling Nationwide policies.  Because a court "cannot assess the weight of conflicting evidence" at this stage of the litigation,  Samuels, 992 F.2d at 16, the motion for judgment as a matter of law on this ground must be denied.

In sum, Nationwide's post-verdict Rule 50 motion for judgment as a matter of law on the Franchise Act count is denied.

C) Connecticut Unfair Trade Practices Act

Nationwide challenges the jury's finding on the CUTPA count on several grounds.

i) Applicability of CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Nationwide first argues that it is entitled to judgment as a matter of law on the CUTPA count because the acts complained of by Charts did not occur "in the conduct of any trade or commerce."  Instead, Nationwide contends that the parties' relationship was similar to a

traditional employer/employee relationship–to which CUTPA does not apply.  See Fenn v. Yale University, 283 F. Supp. 2d 615, 639 (D. Conn. 2003) (citing cases).

CUTPA defines trade and commerce as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4).  Again, one of the facts stipulated to by the parties was that "Alex Charts was the President of Charts Insurance Associates, Inc. ("CIAI"), *which was a Connecticut corporation* engaged in the business of *selling* and *servicing* Nationwide insurance policies and other related products within the State of Connecticut." (emphasis added).  This stipulation demonstrates that the plaintiffs are a Connecticut corporation and its president, not employees of Nationwide or similar to employees of Nationwide.  Indeed, the jury specifically found that they were not employees when it found that the plaintiffs were Nationwide franchisees.  Therefore, there was sufficient evidence from which the jury could have found that the acts complained of occurred in the conduct of trade or commerce.  In so finding, the Court notes that the Connecticut state courts read CUTPA broadly, and the Connecticut Supreme Court has rejected the argument that CUTPA claims may only be brought by a consumer, and not a business.  See, e.g., Larsen, 232 Conn. at 492 ("CUTPA, by its own terms, applies to a broad spectrum of commercial activity," and, because it is "remedial in nature," it must "be liberally construed in favor of those whom the legislature intended to benefit")(citations omitted).  Therefore, the Court finds that the stipulated fact, as well as the evidence presented at trial conforming to that stipulation, provided the jury with a sufficient evidentiary basis for finding that the acts complained of occurred in "the conduct of any trade or commerce."  § 42-110b(a).

ii) Evidentiary Support

Nationwide's next argument can be summarized as follows: (1) for the reasons set forth in its memorandum, it is entitled to judgment as a matter of law on both the Franchise Act count and the good faith and fair dealing count; (2) the CUTPA count is derivative of those two other counts; and, therefore (3) it is also entitled to judgment as a matter of law on the CUTPA count, as there is no other, independent basis for the jury's verdict.  This argument is flawed, however, because the Court has found that Nationwide is not entitled to judgment as a matter of law on the Franchise Act claim.  The jury was instructed that in order for it to find that Nationwide engaged in unfair or deceptive trade practices, it may find that "[t]he practices proved by Charts, without necessarily having been previously considered unlawful, *offend public policy as it has been established by statutes*, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, *statutory*, or other established concept of unfairness." (emphasis added).[12]  Thus, a finding that Nationwide violated the Franchise Act, and the public policy expressed therein, could support a finding that Nationwide also violated CUTPA.  See Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 368, 736 A.2d 824 (1999) (concluding that the trial court's properly found that the defendant had violated CUTPA, because "the defendant's conduct in attempting to terminate the plaintiff's franchise without good cause is a practice that offends the public policy of Connecticut to promote fairness among businesses

---

[12]Further, the Court instructed the jury that it could find that Nationwide engaged in unfair or deceptive trade practices if "the practices proved by Charts are immoral, unethical, or unscrupulous" and "the practices proved by Charts cause unjustified, substantial injury to consumers, competitors, or other businessmen."  The Court also instructed the jury that "a practice can be unfair under CUTPA because of the degree to which it meets one of the criteria or because, to a lesser degree, it meets all three."

behind the franchise act").  Consequently, the Court finds that the conduct underlying the

Franchise Act count provided the jury with a basis for finding that Nationwide also violated

CUTPA. [13]

In sum, Nationwide's motion for judgment as a matter of law on the CUTPA count is

denied.

D) <u>Good Faith and Fair Dealing</u>

The jury found that Nationwide had violated the covenant of good faith and fair dealing

implied into the parties' contracts.  As with the previous counts, Nationwide advances several

grounds upon which it claims it is entitled to judgment as a matter of law on this count.  Each

will be addressed in turn.

i) Good Cause for Termination

Nationwide first argues that the evidence adduced at trial conclusively demonstrates that

---

[13]Because the Court has found that the Franchise Act violation provides a sufficient evidentiary basis for the jury finding in regard to CUTPA, it need not reach the question of whether the jury's finding in regard to the implied covenant of good faith and fair dealing also could support a finding that Nationwide violated CUTPA.

Alex Charts also alleged in his complaint that Nationwide discriminated against him on the basis of age and disability when it terminated his agency, thereby violating CUTPA.  In its post-verdict Rule 50 motion, Nationwide argues that this claim was either abandoned by Charts or not supported by sufficient evidence.  Because the Court has found that the jury's CUTPA verdict was supported by its finding on the Franchise Act, Nationwide's argument need not be addressed.  The Court notes, however, that the instruction given to the jury did not include age or disability discrimination references.  Finally, Nationwide claims that the allegations of "computer crimes" by Nationwide employees should not have been considered because that alleged conduct was outside of the limitations period.  However, in its portion of the jury charge concerning unfair trade practices, the Court specifically instructed the jury that it could not consider "any actions taken by Nationwide or its employees prior to August 11, 1994 [three years before the suit was brought] on Charts' CUTPA claim."  The evidence presented at trial of the "computer crime" concerned events in May, 1994.  Thus, the jury could not have based its CUTPA decision on that evidence, in light of the charge.

it terminated its relationship with Charts for good cause, and, therefore, it is entitled to judgment as a matter of law.  More specifically, Nationwide argues that, because it had good cause to terminate the franchise relationship under the Franchise Act, it also had good cause to terminate the parties' relationship for purposes of the implied covenant of good faith and fair dealing.  The Court has rejected, however, Nationwide's argument that it is entitled to judgment as a matter of law on the issue of "good cause" under the Franchise Act.  Consequently, its related argument concerning "good cause" under the implied covenant of good faith and fair dealing must also be rejected.

ii) No Good Cause Requirement

Nationwide next argues that it did not need to demonstrate good cause to terminate its contracts with Charts and CIAI, as both contracts provided that they were terminable "at any time after written notice."  More specifically, Nationwide argues that the implied covenant of good faith and fair dealing cannot incorporate a "good cause" termination requirement into the parties' contracts because it would be counter to the express terms of those contracts.  Charts argues that there was sufficient evidentiary support for the jury to find that, despite the language in the agreements, the parties' agreements contained an implied promise that they would only be terminated for good cause.  The Court agrees with Nationwide, and finds that it is entitled to judgment as a matter of law on the implied covenant of good faith and fair dealing count.

In Connecticut the implied covenant of good faith and fair dealing cannot be used "to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy."  Verrastro v. Middlesex Ins. Co., 207 Conn. 179, 190, 540 A.2d

693 (1988) (quoting  Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566, 479 A.2d 781

(1984)).

Charts presented the following evidence in support of the argument that, despite the plain

language of the agreements, there was an implied promise that the agency would not be

terminated without good cause:  Gainey, who worked for Nationwide for over thirty-five years,

testified;  "I do not recall any agent being terminated without cause." (Trans. 11/19/04, pg.100).

Helena Charts testified that, in her experience, the types of things that lead to agents being

terminated were taking clients' money or stealing. (Trans. 11/30/04, pg. 134).[14]  Finally, Charts

entered Nationwide's Agency Administration Handbook (the "Handbook") into evidence, which

provides that company-initiated termination of an agency would be "primarily limited" to

circumstances involving, inter alia, "criminal acts," "dishonesty or fraud" and "breach of

contract," and that termination on non-enumerated grounds would be "rare."  (Plaintiffs' Ex. 83,

pg. 21).  This Handbook also sets forth the procedure for the Agency Review Board, which was

an internal Nationwide procedure for agents to appeal "problems which have not been solved to

the agent's satisfaction."  (Id. at 154).[15]  None of this evidence, however, altered or amended the

plain language of the parties' agency agreements, which provide that they are terminable "at any

---

[14]Helena Charts was unavailable to testify at trial, and, therefore, her deposition testimony
was read into evidence, absent objection.

[15]More specifically, the Handbook provides that: "The purpose of the Agent
Administrative Review Board is to ensure mutual understanding and good communication
between the agents and the Companies.  To this end, the Review Board only hears one party at a
time, does not permit attorneys for the Companies or the agent to attend, not is there any written
or electronic record kept.  These procedures have been developed over time to enhance and freely
encourage the open communication by all participants as well as involvement of the members of
the Review Board."  (Plaintiffs' Ex. 83, pg. 156).

time after written notice."  The testimony of Gainey and Helena Charts was based on their general experience, and failed to address the specific agreements between the Charts and Nationwide.  Although the Handbook does seem to imply that a heightened standard will apply to possible agency terminations, it also states in bold type on the cover page that: "The contents of the Handbook are presented as a matter of information only.  The only contractual matters are those expressed in your Agent's Agreement and specifically incorporated by reference made within that contract."  (Id. at cover).   It also provides that "[the] language used in this handbook is not intended to create nor it is to be construed to constitute a contract between Nationwide and any or all of its employees, agents or officers." (Id.)  Finally, the Court is not convinced that Nationwide's provision of an internal appeal process, the Review Board, serves to modify the termination language in the agency agreements, or imposes a good cause requirement for termination.

The Court finds that this evidence is insufficient to alter or amend the plain language of the parties' agreements.  Consequently, Nationwide is entitled to judgment as a matter of law on this count.

E) Conclusion

Nationwide's motion for judgment as a matter of law **[Doc. #254]** is **GRANTED** as to the implied covenant of good faith and fair dealing count, and **DENIED** as to the Franchise Act count and the CUTPA count.

## II     Motion for a New Trial

Nationwide next argues that it is entitled to a new trial pursuant to Rule 59.

A) <u>Standard of Review</u>

Fed. R. Civ. P. 59 provides, in relevant part, that: "A new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ."  Thus, a motion for a new trial may be based on, *inter alia*, an argument that "the trial was not fair to the party moving," or on "questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940).

"A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" <u>Song v. Ives Labs., Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting <u>Smith v. Lightning Bolt Prods., Inc.</u>, 861 F.2d 363, 370 (2d Cir. 1988)).  Unlike with a post-verdict Rule 50 motion for judgment as a matter of law, a Rule 59 motion for a new trial "may be granted even if there is substantial evidence to support the jury's verdict . . . [and] a trial judge hearing a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner."  <u>Id</u>. (quotations and citations omitted).  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. . . . Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility."  <u>Sabir</u>, 214 F. Supp. 2d at 244 (quoting <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998)); <u>see also</u> <u>Dunlap-McCuller v. Riese Organization</u>, 980 F.2d 153, 158 (2d Cir. 1992) ("the grant of a new trial on weight of evidence grounds should be reserved for those occasions where the jury's verdict was egregious").

Nationwide sets forth several arguments in support of its request for a new trial, each of which will be addressed in turn.

B) <u>Failure to Preclude Expert Testimony</u>

Nationwide first argues that the Court erred in permitting Charts' damages expert to testify as to the damages allegedly sustained by Charts.  This argument, which was set forth in a footnote to its memorandum in support of its motion, merely cites to objections it raised previously in the context of its pre-trial motion in limine to preclude the expert, John Allen Kosowsky, from testifying, as well as some of the relevant legal authorities.  This footnote fails to raise any arguments that have not been considered by the Court previously.  Consequently, to the extent Nationwide's motion seeks a new trial on the ground that Kosowsky should not have been permitted to testify as an expert, it is denied for the same reasons set forth in the ruling on Nationwide's motion in limine.  <u>See Ford v. Nationwide Mut. Fire Ins. Co.</u>, 214 F. Supp. 2d 11, 15-16 (D. Me. 2002) (denying a Rule 59 motion because "the record supports my decision as gatekeeper under <u>Daubert</u>, <u>Kumho Tire</u>, and Evidence Rule 702 to let the jury hear his testimony and to let the jury decide what weight to give it. No more need be said").

C) <u>Insufficiency of the Evidence Concerning Damages</u>

Nationwide next argues that Kosowsky's testimony was insufficient to establish Charts' damages to a reasonable degree of certainty, and, therefore, it is entitled to a new trial on damages at the least.  <u>See Expressway Associates II v. Friendly Ice Cream Corp. of Connecticut</u>, 218 Conn. 474, 476-77, 590 A.2d 431 (1991) ("It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty") (citations

omitted).  More specifically, Nationwide maintains that there were four major errors in the

analytical method used by Kosowsky.  Again, this argument already was presented to the Court

through the pre-trial motion in limine, which was denied.  Kosowsky's testimony at trial was

fully consistent with the methodology at issue in the motion in limine.  Moreover, Nationwide

conducted a thorough cross-examination of Kosowsky at trial and highlighted what it claimed

were deficiencies in his methodology and conclusions.[16]  Because Kosowsky testified to a

reasonable degree of certainty that Charts' damages were $2,316.857, and the jury awarded

Charts actual damages of $2,300,000, it appears that the jury found Kosowsky credible, and

credited his testimony accordingly.[17]  The Court concurs with the jury's apparent credibility

determination, and notes that Kosowsky's testimony at trial was more specific, detailed and

informed than even anticipated, and fully supported the jury's finding concerning damages.  See

Song, 957 F.2d at 1047 ("a trial judge hearing a motion for a new trial is free to weigh the

evidence himself and need not view it in the light most favorable to the verdict winner").

Therefore, Nationwide's motion for a new trial is denied.  See Braun Elevator Co. v.

Thyssenkrupp Elevator Co., __ F. Supp. 2d __, __, 2005 WL 1155292 (W.D. Wis., May 16,

2005) ("the challenged factual determinations [of lost profits] were the subject of genuine factual

---

[16]For example, Nationwide argues that Kosowsky was unqualified as an expert on lost
future earnings for Mr. Charts, and his resulting calculations of lost future earnings were flawed,
because Kosowsky's experience primarily involved valuing businesses.  Nationwide had an
opportunity to present this argument to the jury, which was free to use it when determining what
weight to give Kosowsky's testimony.  See, e.g., Bohus v. Beloff, 1991 WL 21654 (E.D. Pa.)
(fact that expert witness had participated in "relatively few complete podiatric evaluations goes to
the weight of his testimony and opinions, not to the issue of his qualifications as an expert
witness"), reversed on other grounds, 950 F.2d 919 (3d Cir. 1991).

[17]Nationwide did not provide its own expert at trial.

26

dispute at trial and there was ample support for the jury to have resolved those disputes in

plaintiff's favor based on the evidence presented").

D) <u>Insufficiency of Jury Instructions</u>

Nationwide next argues that the Court's final instruction to the jury was insufficient

because it: (1) failed to instruct the jury that Charts' admitted payment of the premiums for

insurance policies for unrelated persons constituted "good cause" for termination; (2) failed to

instruct the jury as to "the proper standard for finding the existence of a franchise" under the

Franchise Act; and (3) failed to instruct the jury as to the "proper standard for 'good cause'"

under the Franchise Act.  These claims are all without merit.  Nationwide was accorded ample

time to review the Court's proposed jury instructions and was allowed to make objections to such

instructions at the charging conference. <u>See</u> Fed. R. Civ. P. 51(b)(2).  To the extent that

Nationwide already raised some of these objections at the charging conference, the Court

considered them before issuing the final jury instruction and believes that they were properly

decided at that time.  As to the new objections to the jury instruction raised in Nationwide's Rule

59 motion, the Court believes that it fairly and accurately charged the jury on the appropriate law

in this case and, therefore, finds the new objections to be without merit. Accordingly, Nationwide

is not entitled to a new trial on the ground of improper jury instruction.

E) <u>Inconsistent Verdicts</u>

Finally, Nationwide argues that it is entitled to a new trial because the jury's verdict was

inconsistent in that it found: (1) that Nationwide had acted in bad faith when it violated the

implied covenant of good faith and fair dealing; yet also found (2) that Nationwide should not be

held liable for punitive damages under CUTPA.  Once again, any substantive merit to

Nationwide's argument is precluded from consideration by the Court due to Nationwide's failure to raise a proper objection at an earlier stage of the litigation.  Although not phrased as an attack on the sufficiency of the Court's instructions and verdict form, it is properly construed as such because both the instructions and the verdict form allowed the jury to find as it did.  The Second Circuit recently construed a similar argument as an attack on the sufficiency of the instructions and verdict form:

> Although defendants frame their challenge to the verdict as a challenge to the sufficiency of the evidence, any problem with the verdict is a result of the charge and verdict sheet, which allowed the jury to find in favor of defendants on all of the common law claims, but also in favor of plaintiffs on the CUTPA claim.

Fabri v. United Technologies Intl., Inc., 387 F.3d 109, 121 (2d Cir. 2004).  Consequently, Nationwide was required to raise this objection to the verdict form and instructions, namely that they would permit an inconsistent verdict, prior to their submission to the jury.  Jarvis v. Ford Motor Co., 283 F.3d 33, 56-57 (2d Cir. 2002) ("When a charge or verdict sheet may lead to inconsistent verdicts, a party must object before the jury begins its deliberations") (citing Fed. R. Civ. P. 51).  In addition, once the jury returned with the allegedly inconsistent verdict, Nationwide was required to raise its objection while that jury was still empaneled.  DiBella v. Hopkins, 403 F.3d 102, 117 (2005) ("It is well settled that if a party does not challenge the consistency of jury verdicts while the jury is still empaneled, the objection is waived") (citing cases).  At no time prior to their submission to the jury did Nationwide object to either the verdict form or the jury instruction on the ground that they would permit an inconsistent verdict.  Indeed, Nationwide's proposed jury instructions and verdict form fail to include any language

that would guard against the allegedly inconsistent verdict reached by the jury.  Moreover, once the jury returned its verdict, Nationwide failed to raise any inconsistency objection.

Even if this argument were properly before the Court, however, it would be rejected.  The Court instructed the jury that, in order to award punitive damages, it must find that "Nationwide acted with reckless indifference to the rights of others or an intentional and wanton violation of those rights."  As to "bad faith," however, the Court instructed the jury that: "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.  Bad faith means more than mere negligence; it involves a dishonest purpose."  The Court does not interpret these standards as being harmonious, and believes that a jury could properly find that Nationwide's actions met the standard for "bad faith," yet did not meet the standard for punitive damages.

Moreover, as Charts notes in its opposition memorandum, the Court instructed the jury that if it found in favor of Charts on any of the claims, it "*may* also make a separate and additional award of punitive damages." (emphasis added).  Consequently, even if Nationwide is correct that the standard for a finding of "bad faith" under the implied covenant of good faith and fair dealing and the standards for awarding punitive damages under both CUTPA and the common law are substantially similar, the jury's discretion to award punitive damages renders its inconsistency challenge meritless.[18] See Wright v. Hoover, 329 F.2d 72, 76 (8th Cir. 1964)

---

[18]The Supreme Court has instructed that a facially inconsistent verdict in a civil action is not an automatic ground for vacating the verdict, Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485 (1933), and that a court "must attempt to reconcile the jury's findings, by exegesis if necessary ... before [it is] free to disregard [them]."  Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119(1963).

("fixing damages is peculiarly a jury function"); <u>Lee v. Cross</u>, 39 F. Supp. 2d 170, 172 (D. Conn.1999) ("It is well settled that calculation of damages is the province of the jury") (quoting <u>Ismail v. Cohen</u>, 899 F.2d 183, 186 (2d Cir.1990)); <u>see also</u> <u>Bennett v. Rhodes</u>, 34 Fed. Appx. 963 (5th Cir. 2002) ("The failure to render an award of punitive damages does not render the jury verdict inconsistent, and Bennett does not otherwise persuade us that an award of punitive damages was compelled by the evidence").  Charts has not challenged the jury's failure to award punitive damages in a post-trial motion.

Consequently, to the extent the motion for a new trial claims that the jury's verdict was inconsistent, it is denied.

F) <u>Remittitur</u>

Rule 59(e) also provides that a party may move "to alter or amend a judgment . . . ." Therefore, "[w]hen a defendant's Rule 59 motion contests the size of a damage award, a court must decide whether or not the verdict is excessive. . . If a district court finds that a verdict is excessive . . . under the practice of remittitur [it] may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount. . .  It may not, however, reduce the damages without offering the prevailing party the option of a new trial."  <u>Id</u>. (quotations and citations omitted). "A jury verdict is excessive if it is so high as to 'shock judicial conscience.'" <u>Schneider v. Nat'l R.R. Passenger Corp.</u>, 987 F.2d 132, 136 (2d Cir. 1993) (quoting <u>Nairn v. Nat'l R.R. Passenger Corp.</u>, 837 F.2d 565, 567 (2d Cir. 1988).   In addition, "[a] damage award is excessive if it is the result of a miscarriage of justice and represents a windfall to the plaintiff without regard to [his] injury." <u>Sabir</u>, 214 F. Supp. 2d at 245 (quoting <u>Oliver v. Cole Gift Ctr., Inc.</u>, 85 F. Supp. 2d 109, 114 (D. Conn. 2000)).  In other words, "[t]he court is 'not ... justified in

substituting its judgment for that of the combined experience of twelve jurors . . . unless it conscientiously believe[s] that the jury has exceed the bounds of propriety." Pace v. National R.R. Passenger Corp., 291 F. Supp. 93, 104 (D. Conn. 2003) (quoting Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1329 (2d Cir. 1990)).

Although Nationwide briefly requested that this Court order a remittitur in its original Rule 59 motion, it has failed to address this issue in its subsequently filed memoranda of law. Rather, it has only challenged the damages award on the ground that Kosowsky's testimony failed to prove Charts' damages with reasonable certainty. Nationwide has not explained why, in the event that the Court finds that damages were proved with reasonable certainty, that the amount awarded was excessive. Consequently, Nationwide's request for remittitur is denied. See Broadnax v. City of New Haven, 2004 WL 491069 (D. Conn., Mar. 2, 2004) ("The Court concurs with plaintiff's counsel that the issue of remittitur is not briefed, save for the heading, and the Court will not address this issue except to concur with the plaintiff that the sums returned by the jury are reasonable and consistent with the evidence, and reflect calm deliberation by the jury"), aff'd on other grounds, Broadnax, 415 F.3d at 265.[19]

Even if it were properly briefed and presented, however, the Court finds that the amount awarded by the jury had a proper factual basis and was not excessive as a matter of law. "It is well settled that calculation of damages is the province of the jury." Lee, 39 F. Supp. 2d at 172 (quoting Ismail, 899 F.2d at 186). The jury heard the following evidence concerning Charts' alleged damages: testimony from Mr. Charts as to his prior income stream from his Nationwide

---

[19]See also Broadnax v. City of New Haven, 2005 WL 1691545 (2d Cir., Jul 20, 2005) (summary order analyzing several other issues raised on appeal that presented no novel questions of Second Circuit law)

franchise; testimony from Kosowsky as to how that income could be projected out into the future; and testimony from Gainey and Kapatoes as to how much income they had earned from Nationwide.  Moreover, the jury heard counsel for Nationwide conduct thorough cross-examinations on the issue of damages, and, more particularly, on the issue of Charts' mitigation of his damages.  Nationwide, however, did not present its own damages expert.  Given this testimony, the Court finds that that jury's decision to award Charts $2,300,000 in damages is adequately supported in the record, and that the amount awarded is not excessive as a matter of law.  <u>Schneider</u>, 987 F.2d at 136 ("A jury verdict is excessive if it is so high as to shock judicial conscience"); <u>see also</u>, <u>Holt</u>, 2004 WL 178604 (defendant challenged, *inter alia*,  the jury's "rejection of their argument on mitigation of damages"; the court found that "[e]ach of these decisions required findings of fact. The jury's findings in favor of the plaintiff may make their award seem generous in the eyes of [the defendant], but the award is not excessive as a matter of law, and must therefore be preserved").

**III     Conclusion**

Nationwide's motion for judgment as a matter of law or, in the alternative, motion for a new trial **[Doc. # 254 ]** is **DENIED** in part and **GRANTED** in part.

## **CHARTS' MOTION FOR ATTORNEY'S FEES**

Charts has moved for attorney's fees based on the provisions for such fees set forth in the Franchise Act and CUTPA.  More specifically, Charts seeks attorney's fees in the amount of $1,283.013.55 for work performed through December 31, 2004 and in the amount of $98,204 for subsequent work performed on the post-trial motions.  Finally, Charts requests that the Court increase the award by doubling it due the nature and complexity of this case.  In response,

Nationwide contends that Charts' attorneys should be limited to the amount of attorney's fees established by the contingency fee agreement they entered into with Charts, and that no additional fees are warranted.  In the event that the Court decides that Charts is not limited to the contingency fee amount, Nationwide argues that the fees submitted by Charts' attorneys are excessive.

1) Statutory Fee Provisions

Connecticut follows the American Rule for attorney's fees, awarding fees only where explicitly permitted by the terms of a contract or a statute.  See, e.g., Doe v. State, 216 Conn. 85, 106, 579 A.2d 37 (1990); Marsh, Day & Calhoun v. Solomon, 204 Conn. 639, 653, 529 A.2d 702 (1987); Lorenzetti v. Jolles, 120 F. Supp. 2d 181, 189 (D. Conn. 2000).  Both parties agree that an award of attorney's fees in this matter is permitted by both the Franchise Act and CUTPA.  The parties dispute, however, the extent to which those statutes permit such an award.  Moreover, the parties dispute whether attorney's fees should be awarded to Charts pursuant to the Franchise Act, CUTPA or both.

2) The Franchise Act

A franchisee bringing an action under the Franchise Act, "if successful, shall be entitled to costs, including, but not limited to, reasonable attorneys' fees."  Nationwide concedes that, if its post-trial Rule 50 motion is denied, Charts is entitled to attorney's fees under the Franchise Act.  See, e.g., Virzi Subaru, Inc. v. Subaru of New England, Inc., 742 F.2d 677 (1st Cir.1984) ("The Connecticut [Franchise Act] provides that a franchisee who brings an action for substantive violations *is entitled* to reasonable attorney's fees 'if successful'") (emphasis added) Nationwide argues, however, that such an award is limited to the amount established by the

33

contingency fee agreement Alex Charts entered into with counsel.  In response, Charts contends

that a contingency fee agreement is only a floor, and not a ceiling, to a reasonable award of

attorney's fees pursuant to the Franchise Act.

In Sorrentino v. All Seasons Services, Inc., 245 Conn. 756, 717 A.2d 150 (1998), the

plaintiff entered into a contingency fee agreement that called for his counsel to receive one-third

of any recovery.  Based on the jury's award, therefore, the appropriate award would have been

$48,643.57.  Id. at 773-74.  The trial court reduced the award of attorney's fees to $30,000,

however, based on its finding that the higher (one-third) amount was not justified by the billing

records submitted by plaintiff's counsel.  On appeal, the Connecticut Supreme Court reversed,

holding that "a trial court should not depart from a reasonable fee agreement in the absence of a

persuasive demonstration that enforcing the agreement would result in substantial unfairness to

the defendant." Id. at 776.

In Schoonmaker v. Brunoli, Inc., 265 Conn. 210, 828 A.2d 64 (2003), the Connecticut

Supreme Court expanded on its decision in Sorrentino, concluding that:

> [W]hen a contingency fee agreement exists, a two step analysis is required to
> determine whether a trial court permissibly may depart from it in awarding a
> reasonable fee pursuant to statute or contract. The trial court first must analyze the
> terms of the agreement itself. . . If the agreement is, by its terms, reasonable, the
> trial court may depart from its terms only when necessary to prevent "substantial
> unfairness" to the party, typically a defendant, who bears the ultimate
> responsibility for payment of the fee. . . By contrast, if the trial court concludes
> that the agreement is, by its terms, unreasonable, it may exercise its discretion and
> award a reasonable fee in accordance with the factors enumerated in rule 1.5(a) of
> the Rules of Professional Conduct.

Id. at 270-72 (citations omitted).  Consequently, the Court reversed the judgment of the trial

court, which had made an award of attorney's fees greater than called for by the terms of the

contingency fee agreement, concluding that the trial court "violated both the spirit and the letter

of <u>Sorrentino</u> by not giving the existing contingency fee agreement its due regard."  <u>Id</u> at 272.

Therefore, pursuant to the teachings of <u>Schoonmaker</u> and <u>Sorrentino</u>, Nationwide argues

that an award of attorney's fees to Charts under the Franchise Act is capped by the amount

established by the contingency fee agreement.  This argument was rejected previously by a judge

in this District, however, in <u>Fabri v. United Techs, International, Inc.</u>, 193 F. Supp. 2d  480,

484-85 (D. Conn. 2002).  In <u>Fabri</u>, the Court first distinguished the holding of <u>Sorrentino</u> on the

ground that CUTPA, the statute at issue in <u>Fabri</u>, has important differences from § 31-290a, the

statute at issue in <u>Sorrentino</u>.  <u>Id</u>. at 484.  Moreover, the Court found that, "[e]ven construing

<u>Sorrentino</u> to apply to all state fee statutes, it holds at best that contingent fee agreements are a

floor to a reasonable award."  <u>Id</u>.  at 484.  After reviewing the policy behind <u>Sorrentino</u>'s holding,

the Court then noted that "[t]here is no parallel need to make contingent fee agreements into a

ceiling to protect a plaintiff's jury award.  As such, <u>Sorrentino</u> need not be extended beyond its

facts as Defendants would do."  <u>Id</u>. at 485.  In <u>Schoonmaker</u>, the Connecticut Supreme Court

explicitly noted that it "agree[d] with the recent characterization of <u>Sorrentino</u> by the United

States District Court for the District of Connecticut" in <u>Fabri</u>, and quoted that Court's finding

that, "[e]ven construing <u>Sorrentino</u> to apply to all state fee statutes, it holds at best that contingent

fee agreements are a floor to a reasonable award."  <u>Schoonmaker</u>, 265 Conn. at 271.

Consequently, the Court finds that the Connecticut Supreme Court's decisions in <u>Sorrentino</u> and

<u>Schoonmaker</u> mean that a contingency fee agreement only limits the floor for an award of

"reasonable" attorney's fees under statutes such as the Franchise Act, and do not limit the top

range for such an award.

Accordingly, the bottom range of the award the Court "shall" make to Charts pursuant to the Franchise Act is the amount established by the contingency fee agreement Alex Charts entered into with his attorneys, which provides that his attorney's fee "will be one quarter (25%) of any recovery obtained in the case, after deduction of expenses, either by way of settlement, trial or appeal."  At a minimum, this provisions requires an award of $575,000 ($2,300,000 x .25) pursuant to the Franchise Act.[20]  The question becomes, therefore, whether the Court should depart upwards from that agreement and award the full amount requested by Charts: $1,381,217.55, which was derived through Charts invoking the "lodestar" method of  multiplying the reasonable hours worked by a reasonable hourly rate.  See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

As recounted in the introductory portion of this ruling, this case has a long and protracted history.  Charts successfully challenged an adverse summary judgment ruling before the Second Circuit, obtained a favorable ruling on a second motion for summary judgment in this Court and obtained a favorable jury verdict at a trial conducted eight years after the case was initially filed.  Given these factors, the Court finds that Charts is entitled to an attorney's fee award that is greater than the one provided for by the contingency fee agreement.  In determining what amount is warranted, the Court has considered the twelve factors generally relevant to an award of

---

[20]Nationwide has not argued that, pursuant to Schoonmaker, the Court should award *less* than that amount in order to prevent it from suffering "substantial unfairness."  For example, Nationwide has not argued that, because this was a three count complaint, an award of the full contingency fee under the Franchise Act fee provision would include fees for time that was not spent on the Franchise Act count, but rather was spent on either the CUTPA or the implied covenant of good faith and fair dealing count.

reasonable attorney's fees that were first set forth in <u>Johnson v. Georgia Highway Express, Inc.</u>,

488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee for similar work in the community;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation and ability of the attorneys;
> (10) the "undesirability" of the case;
> (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.

<u>See</u> <u>Hernandez v. Monterey Village Associates Ltd. Partnership</u>, 24 Conn. App. 514, 517 n. 3,

589 A.2d 888 (1991) (adopting the <u>Johnson</u> factors); <u>see also</u> <u>Steiger v. J.S. Builders, Inc.</u>, 39

Conn. App. 32, 38 (1995) (applying the <u>Johnson</u> factors in CUTPA context); <u>Sabir v. Jowett</u>, 214

F. Supp. 2d 226. 249 (D. Conn. 2002) (applying <u>Johnson</u> factors after favorable jury verdict on

28 U.S.C. § 1983 claim and intentional infliction of emotional distress claim);   Here, after

consideration of those twelve factors, the Court awards Charts $750,000 in attorney's fees.  This

amount, although substantially higher that called for by the contingency fee agreement, also is

substantially less than requested by Charts.   The following factors were among those

contributing to the Court's decision concerning the size of the award:  Charts' request was based

on current rates, rather than the rates billed at the time the work was conducted–which is some

instances was ten years' prior.[21]  Moreover, many of the entries in the billing record appeared to

---

[21]Nationwide's argument that the current fees submitted by Charts are excessive, however, is rejected.  The current hourly fee charged by Attorney Garcia, Charts' lead attorney, is $375.00.  Given the qualifications set forth in Attorney Garcia's affidavit, as well as this Court's

be duplicative, excessive or unrelated to this case. Charts' attorneys also set their recovery percentage at twenty-five percent in the contingency fee agreement, and this factor must be considered along with the remaining eleven <u>Johnson</u> factors. Nevertheless, the novelty and difficulty of the questions presented by this case, the skill required to perform the legal service properly, the amount involved and the results obtained and the experience, reputation and ability of the attorneys all counsel heavily in favor of an award above the contingency fee amount.

As the Court noted in <u>Fabri</u>, "[a] fee award is an obligation of a defendant to a plaintiff. A contingent fee agreement is an agreement between a plaintiff and his or her counsel, an agreement to which a defendant is not a party, and which should not be permitted to alter the purpose of the statutory award." The Franchise Act is a remedial statute, and courts read it accordingly. <u>See, e.g.</u>, <u>Hartford Electric Supply Co.</u>, 250 Conn. at 345 (the "[F]ranchise [A]ct's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff"). The Franchise Act provides that a successful plaintiff is entitled to "reasonable attorney's fees," and, given the procedural history of this case, as well as all of the <u>Johnson</u> factors, an award of $750,000 represents "reasonable attorney's fees."

---

observation as to the caliber of representation provided by him in this matter, this fee is not excessive. <u>See, e.g.</u>, <u>Kaplan v. Gruder</u>, 2000 WL 767697 (Conn. Super. Ct., May 25, 2000) (finding that a requested fee of $450 and $480 per hour, which were "the rates prevailing in New York City," are "are considerably different from the rates here in Connecticut," and, therefore, the attorney was only entitled to $350 per hour). Moreover, as Charts notes, this fee, as well as the others charged by Charts' attorneys, appears to be comparable to, or even less then, the fees charged attorneys at the firm representing Nationwide in this matter.

2) <u>CUTPA</u>

Charts also has moved for attorney's fees under CUTPA, which provides: "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." Conn. Gen. Stat. § 42-110g(d). As both parties recognize, an award of attorney's fees under CUTPA is discretionary. <u>See, e.g.</u>, ; <u>Riggio v. Orkin Exterminating Co., Inc.</u>, 58 Conn. App. 309, 317, 753 A.2d 423 (2000) ("[t]he trial court *has discretion* whether to award attorney's fees under CUTPA") (emphasis added). Exercising its discretion, the Court finds that the same award of $750,000 also is appropriate under § 42-110g(d).

CUTPA explicitly provides that an award of attorney's fees must not be based on "the amount of recovery." § 42-110g(d). Thus, a contingency fee agreement does not limit the amount a court may award to a successful CUTPA plaintiff. <u>See, e.g.</u>, <u>Fabri</u>, 193 F. Supp. 2d at 484-85. Instead, the Court must look to the work "reasonably performed" by an attorney on the CUTPA claim, and claims related to the prosecution of the CUTPA claim, in order to determine a fee award. <u>Jacques All Trades Corp. v. Brown</u>, 57 Conn. App. 189, 200, 752 A.2d 1098 (2000). Turning the to the work performed by Charts' attorneys in this case, the Court first notes that the factual basis for the CUTPA count and the Franchise Act count were inextricably intertwined, as evidenced by the Court's ruling on Nationwide's motion for judgment as a matter of law on the CUTPA count. More generally, this Court previously has stated: "Where a particular case involves several legal theories relating to a common core of underlying facts, a court need not analyze fees on a claim-by-claim basis, but instead 'should focus on the

39

significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" Sabir, 214 F. Supp. 2d at 249 (quoting Hensley, 461 U.S. at 435). Thus, although Nationwide argues that Charts has not identified the work which was related solely to the CUTPA claim, the facts of this case made such a task very difficult. Consequently, the Court may look to the total amount of effort expended by Charts' attorneys when determining what fee is appropriate under CUTPA.

In the section of this ruling addressing attorney's fees under the Franchise Act, the Court determined that an award of $750,000 accurately reflects the reasonable hours worked by Charts' attorney, and is based on a reasonable billing rate that is adjusted for present value, as well as affected by the other factors. Such an award limits billings submitted for duplicative, excessive or unrelated work, while at the same time recognizes that the complex and novel legal issues presented by this case required a significant amount of effort and billings. In sum, the Court finds that an award of $750,000 provides compensation for work "reasonably performed by [Charts'] attorney[s]" on this case.

C) Multiplier

Charts' counsel also requests that the award of attorney's fees be adjusted upwards by a multiplier of 2.0 due to the "extreme risk" they undertook in this case, the "superior" representation they provided and the "exceptional" results they achieved through the "unprecedented" jury verdict. See Hensley, 461 U.S. at 434 ("other considerations . . . may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained'"). Although the Court agrees that Charts' attorneys provided able representation, the Court nevertheless declines to double the attorney's fee award. All of the

40

factors cited by Charts were considered by the Court in determining the "lodestar" amount to

award, and they do not justify an additional enhancement.  "The party asking the court to depart

from the lodestar amount bears the burden of proving that such a departure is necessary to the

calculation of a reasonable fee."  Evans v. State of Connecticut, 967 F. Supp. 673, 692 (D. Conn.

1997).  Charts has not met that burden here.

     D) Conclusion on Attorney's Fees

     In sum, whether made pursuant to the provision in the Franchise Act for attorney's fees,

to the provision in CUTPA for attorney's fees or pursuant to both provisions, the Court finds that

an award of $750,000 in attorney's fees to Charts is reasonable and appropriate.

     E) Costs

     Charts also has requested $30,341.41 in expenses incurred in the prosecution of this

action, covering expenses such as copying costs, messenger fees and expert witness fees.

Nationwide objects to the amount of expenses claimed by Charts, maintaining that there is no

statutory basis for particular expenses submitted by Charts.  As the Connecticut Supreme Court

has explained: "It is a settled principle of our common law that parties are required to bear their

own litigation expenses, except as otherwise provided by statute. . . Furthermore, because costs

are the creature of statute . . . unless the statute clearly provides for them courts cannot tax them."

M. DeMatteo Construction Co. v. New London, 236 Conn. 710, 674 A.2d 845 (1996) (citations

and quotations omitted).

     Both the Franchise Act and CUTPA allow the Court to award Charts "costs," with the

only difference being that the Court "shall" make such an award under the Franchise Act, and

"may" make such an award under CUTPA.  Of the $30,341.41 requested, $26,618.63 related to

expenses incurred for items such as messenger services, copies, travel and court reporter services. Reviewing those expenses, the Court finds that they should be reduced by one third to eliminate duplicative, unrelated or unnecessary expenses.[22]   Therefore, the Court awards Charts $17,745.75 in costs pursuant to the Franchise Act and CUTPA.  See  Gerner v. Applied Industrial Materials Corp., 2005 WL 1805670 at *10 (Conn. Super. Ct., June 30, 2005)(awarding forty percent of claimed costs for "readily understandable costs of litigation such as copying charges, delivery expenses and transcript costs"); Bristol Technology, Inc. v. Microsoft, 127 F. Supp. 2d 64, 84 (D. Conn.2002) (awarding as "costs" pursuant to § 42-110g(d) for "disbursements for delivery services" and "[c] for travel, deposition transcripts, and expert witness fees").

The Court will not award Charts the requested $1,579.78 fee for Kitty Koenig, a "trial analyst" employed by the law firm representing Charts.  The remaining portion of the requested amount, $2,143, was a fee paid to Kosowsky for his expert witness testimony.  There is some dispute about whether fees paid to an expert accountant are recoverable under statutes such as the Franchise Act and CUTPA, as both of those statutes fail to define what "costs" are recoverable. More specifically, there is a dispute over whether any expert fee may be awarded under such statutes, or only fees paid to an expert listed in Connecticut's general fee provision statutes, Conn. Gen. Stat. §§ 52-257 and 52-260.[23]  The Connecticut Appellate Court has held that such

---

[22]For example, there are numerous entries for "Westlaw research," however there is no indication as to what this research was related to, which count it was related to or for what motion or stage of the litigation it related.

[23]Generally, Connecticut courts interpret "cost" provisions narrowly.  See M. DeMatteo Construction Co. v. New London, 236 Conn. 710, 674 A.2d 845 (1996) (concluding that Conn. Gen. Stat. § 12-117a did not mention appraisal costs, and, therefore, such costs only allowable if provided by the general fee statutes §§ 52-527 and 52-560).  In the context of fees for expert witnesses, the Connecticut Appellate Court has applied the teachings of M. DeMatteo

experts' fees are not within the "costs" provided by the CUTPA statute.  Miller v. Guimaraes, 78

Conn. App. 760, 829 A.2d 422 (2003) (finding that the trial court improperly awarded taxable

costs for the fees paid to an attorney serving as an expert on the legal fees that should be awarded

to the plaintiff).  This Court assumes that Connecticut courts would find the same as to permitted

costs under the Franchise Act.  Thus, no experts' fees will be awarded by virtue of the "costs"

references in CUTPA and the Franchise Act.

In sum, the Court awards Charts $750,000 in attorney's fees and $17,745.75 in costs.

## CHARTS' MOTION FOR PREJUDGMENT INTEREST

Charts also has moved for prejudgment interest on the jury's award of $2.3 million in

damages.  It is well settled that "[w]hen the court's jurisdiction is based upon diversity, an award

of prejudgment interest is governed by state law."  Brandewiede v. Emery Worldwide, 890 F.

Supp.  79, 82 (D. Conn.1994).  The relevant Connecticut statute provides: "Except as provided in

sections 37-3b, 37-3c and 52-192a, interest at the rate of ten percent a year, and no more, may be

---

Construction Co. and found that experts not listed in § 52-260 may not have their fees taxed as
costs. Arnone v. Town of Enfield, 79 Conn. App. 501, 831 A.2d 260 (2003) (reversing award of
$6,479 in costs for payment of expert witness fees on the ground that, because § 31-51m does not
expressly provide for expert witness fees, such fees may only be awarded if provided for in § 52-
260(f), the Connecticut statute addressing fees for witnesses, and that an economist is not a listed
expert witness whose cost may be reimbursed under § 52-260(f)); Miller v. Guimaraes, 78 Conn.
App. 760, 829 A.2d 422 (2003) (concluding that the trial court improperly awarded a successful
CUTPA plaintiff $1,000 as a taxable cost for an expert who was an attorney, as that type of
expert was not covered by the provision for payment of expert witness fees in § 52-260).  Those
decisions, however, have been subject to criticism.  See, e.g., Gerner v. Applied Industrial
Materials Corp., 2005 WL 1805670 (Conn. Super. Ct., June 30, 2005) (citing cases,
distinguishing Miller, and finding that the plaintiff was entitled expert fees as a "cost" pursuant §
42-110g(d), without regard to § 52-260); see also Duerr v. DiCesare, 37 Conn. L. Rptr. 909,
2004 WL 2361833 (Conn. Super. Ct., Oct 1, 2004) (disagreeing with Miller, yet "follow[ing] the
rule set forth therein"); Bristol Technology, Inc, 127 F. Supp. 2d at 82 ("In state court, Conn.
Gen.Stat. Sec. 52-257(b) provides for taxable costs. CUTPA, however, authorizes the award of
costs over and above these taxable cost provisions").

recovered and allowed in civil actions . . . as damages for the detention of money after it becomes

payable." Conn. Gen. Stat. § 37-3a.[24]   However, this Court previously has found that, "[a]s such

interest is an element of [the plaintiff's] damages, 'the determination of whether interest pursuant

to § 37-3a should be awarded is a question for *the trier of fact*.'" <u>Neptune Group, Inc. v. MKT,</u>

<u>Inc.</u>, 205 F.R.D. 81, (D. Conn. 2002) (emphasis added) (quoting <u>Foley v. Huntington Co.</u>, 42

Conn. App. 712, 682 A.2d 1026 (1996).  Similarly, in <u>Retepromaca Representaciones Tecnicas</u>

<u>Proyectos Y Sistemas, C.A. v. The Ensign-Brickford Co.</u>, 2004 WL 722231 at *8 (D. Conn., Mar

30, 2004), Judge Underhill concluded, "after a thorough review of relevant state and federal cases

. . . that the question of whether to award prejudgment interest pursuant to section 37-3a must be

decided by the trier of fact-in this case the jury."  Consequently, because the issue of prejudgment

interest was not raised until after judgment had entered, and, therefore, was not charged to the

jury, Judge Underhill rejected the plaintiff's argument that he had discretion to award such

interest.  Charts' attempt to distinguish those two cases, and the clearly established law that they

rely on, is unpersuasive.  Although Charts did request prejudgment interest pursuant to § 37-3a in

the amended complaint, the issue was not submitted to the jury for consideration.  Indeed, Charts

failed to raise that issue during trial, the charging conference or in a motion before

---

[24]Charts also moved for prejudgment interest pursuant to 28 U.S.C. § 1961(a).  As Nationwide notes in its memorandum in opposition, however, § 1961 only provides for postjudgment interest.  <u>See</u> § 1961(a) (providing that "interest shall be calculated from the date of the entry of the judgment"); <u>Mobil Exploration & Producing North America, Inc. v. Graham Royalty Ltd.</u>, 910 F.2d 504 (8th Cir. 1990) (in a diversity case, concluding that "28 U.S.C. § 1961 must be applied to calculate the rate of *post*-judgment interest")(emphasis added).  Charts failed to respond to Nationwide's memorandum in opposition, and has not requested that this Court award postjudgment interest pursuant to § 1961.  Consequently, the Court declines to construe Charts' motion as one seeking both pre- and postjudgment interest.

the jury was discharged.  Consequently, the Court is without the ability to award such damages, and the motion for prejudgment interest **[Doc. # 260]** is **DENIED**.[25]

<u>**CONCLUSION**</u>

1) Nationwide's motion for judgment as a matter of law or, in the alternative, motion for a new trial **[Doc. # 254 ]** is **DENIED** in part and **GRANTED** in part.

2) Charts' motion for attorney's fees **[Doc. # 262 ]** is **GRANTED**, and Charts is awarded $750,000 in attorney's fees and $17,745.75 in costs.

3) Charts' motion for prejudgment interest **[Doc. # 260]** is **DENIED**.

SO ORDERED this  25th  day of October 2005, at Hartford, Connecticut.


 /s/ CFD
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[25]Nationwide also argues that prejudgment interest is not appropriate in this case because the jury's award of damages was not an award of "damages for the detention of money after it be[came] payable . . . ."  § 37-3a.  Rather, Nationwide claims it was an award for lost profits, as argued by Charts, and, therefore, it cannot support an award of prejudgment interest pursuant to § 37-3a.  Because the Court has found that the question of prejudgment interest was not properly submitted to the jury, and such an award is therefore inappropriate, this argument need not be addressed.